**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BOARD OF TRUSTEES, SPORTS ARENA EMPLOYEES' LOCAL NO. 137 RETIREMENT PLAN,
485 Route 1, Suite B-401
Iselin, NJ 08830

BOARD OF TRUSTEES OF THE BEVERAGE AND BREWERY DRIVERS LOCAL UNION NO. 67 PENSION FUND,
603 Stanwix Street, Suite 1500
Pittsburgh, PA 15222

BOARD OF TRUSTEES - CHICAGO FOUNDRY WORKERS PENSION PLAN,
205 West 4th Street, Suite 225
Cincinnati, OH 45202

BOARD OF TRUSTEES OF CONCESSION & PROGRAM EMPLOYEES LOCAL 468 PENSION,
3530 Camino del Rio North #110
San Diego, CA 92018

Civil Action No. 26-cv-3073

BOARD OF TRUSTEES, OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION LOCAL UNION 394 PENSION TRUST FUND,
2550 W. Union Hills Drive, Suite 290
Phoenix, AZ 85027

BOARD OF TRUSTEES, EMPLOYERS-LOCAL 1167 JOINT PENSION PLAN,
1055 Park View Drive, Suite 111
Covina, CA 91724

BOARD OF TRUSTEES OF GREATER ST. LOUIS SERVICE EMPLOYEES PENSION PLAN,
13801 Riverport Drive, Suite 501
Maryland Heights, MO 63043

BOARD OF TRUSTEES IBEW 1919 PENSION FUND,

20000 Horizon Way, Suite 600
Mt. Laurel, NJ 08054

BOARD OF TRUSTEES OF THE INDUSTRIAL RELATIONS COUNCIL OF FURNITURE MANUFACTURERS IN SOUTHERN CALIFORNIA AND CABINET MAKERS, MILLMEN, AND INDUSTRIAL CARPENTERS LOCAL 721 PENSION TRUST,
1200 Wilshire Blvd., 5th Floor
Los Angeles, CA 90017

BOARD OF TRUSTEES OF THE IRON WORKERS LOCAL 473 PENSION FUND, (also commonly referred to as the Pension Trust Estate for Shopmen's Local Union No. 473) (EIN: 36-2427068),
625 Enterprise Drive
Oak Brook, IL 60523

BOARD OF TRUSTEES LOCAL 400 FOOD TERMINAL EMPLOYEES' PENSION PLAN,
707 Brookpark Road
Cleveland, OH 44109

BOARD OF TRUSTEES LOCAL 422 PENSION TRUST FUND,
707 Brookpark Road
Cleveland, OH 44109

BOARD OF TRUSTEES OF THE OPERATING ENGINEERS LOCAL 800 AND THE WYOMING CONTRACTORS ASSOCIATION, INC. PENSION PLAN,
555 S. Wolcott Street
Casper, WY 82601

BOARD OF TRUSTEES, OREGON PRINTING INDUSTRIES PENSION TRUST,
5331 S. Macadam Avenue, Suite 258
Portland, OR 97239

BOARD OF TRUSTEES PAINTERS AND ALLIED TRADES PAINT MAKERS PENSION PLAN,

1200 Wilshire Boulevard, 5th Floor
Los Angeles, CA 90017

BOARD OF TRUSTEES OF THE ST. LOUIS GRAPHIC ARTS PENSION FUND,
1544 Woodlake Drive
Chesterfield, MO 63017

BOARD OF TRUSTEES, LOCAL 1776KS, WD AND EMPLOYERS PENSION FUND,
345 Southpointe Boulevard, Suite 200
Canonsburg, PA 15317

BOARD OF TRUSTEES, USW DISTRICT 10 LOCAL 286 PENSION PLAN, and
410 North 8th Street
Philadelphia, PA 19123

CTDU PARTITION PENSION FUND,
6500 West 65th Street, Suite 203
Chicago, IL 60638

TRUSTEES OF THE EMPLOYER-LOCAL NO. 375 PENSION PLAN,
1605 N. Cedar Crest Boulevard, Suite 510
Allentown, PA 18104

UFCW PENSION FUND OF NORTHEASTERN PENNSYLVANIA,
3031 B. Walton Road
Plymouth Meeting, PA 19462

TRUSTEE OF THE WYOMING CARPENTERS' PENSION FUND,
830 Bear Tavern Road
West Trenton, NJ 08628

*Plaintiffs*,

v.

PENSION BENEFIT GUARANTY CORPORATION,
445 12th Street S.W.
Washington, DC 20024-2101

*Defendant*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. The American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("ARPA") established a special financial assistance ("SFA") program to ensure the solvency of multiemployer pension plans ("MEPPs")—plans established by an agreement between multiple employers and a union.

2. Under ARPA, the Pension Benefit Guaranty Corporation ("PBGC") is responsible for administering the SFA program. But rather than faithfully follow ARPA, the PBGC has contrived arbitrary roadblocks that have delayed and, without further court intervention, will likely prevent certain MEPPs from ever receiving the SFA to which they are entitled.

3. Chief among those roadblocks is the PBGC's bar on MEPPs submitting applications for SFA. Contrary to Congress's instructions to the PBGC to process all SFA applications within 120 days, the PBGC consigned plans to an indefinite "waitlist," where they have languished waiting to apply, in many cases for more than a year.

4. The PBGC has also barred terminated MEPPs—that is, MEPPs that are not adding new participants or allowing existing participants to accrue additional benefits, but continue to pay benefits—from applying for SFA on the theory that they are ineligible.

5. The Second Circuit rejected that theory. In *Board of Trustees of Bakery Drivers Local 550 & Industry Pension Fund v. Pension Benefit Guaranty Corp.*, 136 F.4th 26 (2d Cir. 2025) ("*Bakery* Decision"), a unanimous panel overturned the PBGC's position because it was "contrary to law."

6. The PBGC then filed a petition for a writ of certiorari. *Pension Benefit Guar. Corp. v. Board of Trs. of the Bakery Drivers Local 550 & Indus. Pension Fund*, No. 25-701, 2025 WL 3681858 (U.S. Dec. 12, 2025) ("*Bakery* Cert Petition"). In its petition, the PBGC told the Supreme

Court that, even in the absence of a circuit split, immediate review was necessary because, among other things: (i) "[t]he effects of the Second Circuit's decision extend beyond this particular case," indeed, "nationwide," and would, therefore, "result in the payment of about $6 billion more" in SFA; (ii) ARPA "does not grant the PBGC discretion to withhold funds from eligible plans that submit compliant applications[;]" and (iii) Congress established "deadlines for submission of SFA applications" that were quickly approaching. *Bakery* Cert Petition at *23–27.

7. The Supreme Court denied the *Bakery* Cert Petition on May 18, 2026. 224 L. Ed. 2d 844 (2026). But the PBGC has doubled down—it refuses to allow terminated MEPPs it believes are outside the Second Circuit to even apply. That is a brazen attempt to avoid judicial review of an issue on which the PBGC has litigated and lost, and a ploy to run out the clock.

8. Plaintiffs are the sponsors of 22 terminated MEPPs (the "Excluded Plans") named in the above caption. Through this lawsuit, they ask the Court to stop the PBGC's misconduct and undo the damage it has caused.

## INTRODUCTION

9. Millions of Americans depend on pensions promised to them by their employers. They plan their lives around that expected income, which they earned over a lifetime of honest work.

10. Over 50 years ago, Congress passed the Employee Retirement Income Security Act of 1974 ("ERISA"), a "comprehensive and reticulated statute . . . designed . . . to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986) (internal quotation marks omitted).

11. ERISA, among other things, established the PBGC. 29 U.S.C. § 1302. Congress tasked the PBGC with guaranteeing pension benefits through an insurance-like arrangement: pension plans must pay premiums, and when a plan fails, the PBGC steps in to offer a guaranteed minimum benefit.

12. In 2021, Congress recognized that many MEPPs were under immense financial strain, which the pandemic exacerbated. Congress therefore passed ARPA, which among other things, established the SFA program. *See* 29 U.S.C. § 1432. Through ARPA, Congress provided the PBGC an uncapped appropriation and directed it to provide funding to secure the solvency of these troubled MEPPs for almost 30 years. *See id.* §§ 1305(i)(2) ("appropriat[ing] from the general fund such amounts as are necessary for the costs of providing financial assistance under [29 U.S.C. § 1432] and necessary administrative and operating expenses of the corporation."), 1432(j)(1) (providing, with one exception, SFA in such amount "required for the plan to pay all benefits due during the period beginning on the date of payment of the special financial assistance payment under this section and ending on the last day of the plan year ending in 2051, with no reduction in a participant's or beneficiary's accrued benefit as of March 11, 2021[.]").

13. Congress directed the PBGC to make applications for SFA easy, and to decide them quickly. It commanded that the PBGC only require plans to submit the "minimum necessary" information to apply for SFA. *Id*. § 1432(c). And it gave the PBGC only 120 days to adjudicate applications—or else an application for SFA was deemed granted. *Id.* § 1432(g).

14. The PBGC has done exactly the opposite. It has required plans to revise and resubmit applications multiple times. And it has concocted regulations and guidance explicitly designed to prevent plans from applying for SFA.

15. Most perniciously, the PBGC devised a "waitlist" scheme. Under that scheme, a plan was not allowed to submit a full application for SFA until the plan reached the top of the waitlist and the PBGC notified it that it would be permitted to apply. Any application filed without permission would not be considered filed.

16. The PBGC moved slowly, and invited few plans to submit or revise applications. In the months before the December 31, 2025 deadline to file "initial" applications for SFA, nearly a hundred plans were still on the waitlist and had not been permitted to file an application for SFA. The looming deadline did nothing to spur the PBGC, and it made no effort to allow additional applications.

17. Rather than lose the ability to apply, plans availed themselves of an alternative "lock-in application" process under 29 C.F.R. § 4262.10(g), under which a plan could email the PBGC limited information to "lock in" a base date for application calculations. *See* SFA Guidance. The PBGC considered those to be "initial applications." 29 C.F.R. § 4262.10(g)(4). Plans who filed lock-in applications thus ensured that they would not miss the December 31, 2025 deadline.

18. But the PBGC did not actually consider the lock-in applications; it summarily denied every single one. That was a feature, not a flaw—the PBGC's regulations said it would do just that. *Id.*

19. In other words, rather than adjudicate applications within 120 days, the PBGC helped itself to an indefinite extension by preventing plans from fully applying in the first place, forcing terminated MEPPs to use a regulatory process just to preserve the *possibility* of applying for SFA at some indeterminate future point.

20. Further, the PBGC instructed plans that they could not "revise" their applications until the PBGC invited them to do so. *See* 29 C.F.R. § 4262.10(a), (d) and (e), and SFA-specific guidance (the "SFA Guidance").[1]

21. As of this complaint, approximately 67 plans, including the Excluded Plans, are on the PBGC's waitlist, with no ability to revise their lock-in applications absent the PBGC's approval, and no indication from the PBGC as to whether it will ever allow them to fully apply. The average time the Excluded Plans have been on the waitlist—in violation of Congress's clear instructions—is 347 days.

22. Congress provided that all revised applications be submitted to the PBGC by December 31, 2026. *See* 29 U.S.C. § 1432(f). That deadline is fast approaching, and the PBGC has not said when, if ever, it will allow waitlisted plans to apply. Every indication is that, for the Excluded Plans, it will not.

23. It gets worse. The PBGC decided, contrary to ARPA, that terminated plans are ineligible for SFA. Yet more than a year ago, the Second Circuit rejected the PBGC's position and held that terminated plans were eligible for SFA. *See Bakery*, 136 F.4th 26. The Supreme Court then denied the PBGC's petition for certiorari. 224 L. Ed. 2d 844 (2026).

24. Yet the PBGC has shown no more respect for the Courts than it has for Congress. Rather than allow terminated plans outside the Second Circuit to submit applications and deny them based on the PBGC's fallacious position, the PBGC has decided to keep them on the waitlist indefinitely. It has schemed to shield its rejected interpretation of ARPA from judicial review in other circuits by not even allowing those plans to apply.

[1] PBGC, *SFA application guidance for non-priority group plans*, https://www.pbgc.gov/arp-sfa/guidance-non-priority-group-plans (Last updated Mar. 9, 2023).

25. The Excluded Plans are all terminated MEPPs that the PBGC believes are located outside the Second Circuit that the PBGC has unlawfully barred from applying for SFA.

26. Many Excluded Plans have been waiting for over a year to file a revised SFA application—far beyond Congress's 120-day requirement for consideration of applications and revised applications. *See* 29 U.S.C. § 1432(f) & (g).

27. The PBGC admitted in the *Bakery* case that "ERISA's SFA provision does not grant the PBGC discretion to withhold funds from eligible plans that submit compliant applications." *Bakery* Cert Petition, 2025 WL 3681858, at *23.

28. Yet its regulations and guidance tell a different story—the PBGC has used them to withhold funds from eligible plans by barring them from submitting full applications.

29. The PBGC's actions are unlawful. Congress gave the PBGC 120 days to consider applications and revised applications. It did not give the PBGC any authority to restrict what plans applied for SFA after March 2023. The PBGC's "waitlist" ploy directly contravenes ARPA. It must be vacated under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

30. The PBGC has unreasonably delayed and unlawfully withheld giving Plaintiffs permission to file revised applications for SFA and considering those applications. Again, the APA demands that the Court step in to stop the PBGC's misconduct.

31. The PBGC has acted arbitrarily and capriciously by disregarding its own waitlist guidance, which provides that plans are permitted to apply from the waitlist chronologically. The PBGC has begun contacting plans it believes are within the Second Circuit and allowing them to apply, jumping the line. As of this action, at least 15 plans were allowed to file revised applications even though they were lower on the waitlist than 15 Excluded Plans.

32. The PBGC's delay tactics have harmed the Excluded Plans and their more than 25,000 participants and beneficiaries. Insolvent plans have had to cut benefits by more than 45% in some cases, and retirees entitled to benefits from currently solvent plans are preparing for looming cuts of the same or greater magnitude when the plans become insolvent. *See* 29 U.S.C. § 1322a(c). SFA would have prevented those cuts and restored benefits to others, including through retroactive make-up payments. Retirees have seen modest pensions become meager, and have had to live with the consequences. The harm continues.

33. ERISA provides that any plan sponsor who "is adversely affected by any action of the [PBGC] with respect to a plan in which such person has an interest . . . may bring an action against the corporation for appropriate equitable relief in the appropriate court." 29 U.S.C. § 1303(f). Because the Excluded Plans have been harmed by the PBGC's actions, the Court should grant appropriate equitable relief to remedy that harm.

34. The Court should vacate the PBGC's unlawful waitlist scheme. It should require the PBGC to immediately allow the Excluded Plans to revise their applications for SFA. And it should order additional relief to ensure that the Excluded Plans are not prejudiced by the PBGC's total disregard of Congress's instructions.

## JURISDICTION AND VENUE

35. This action arises under ERISA, 29 U.S.C. § 1001 et seq. and the APA, 5 U.S.C. § 551 et seq.

36. The PBGC is an agency for purposes of 5 U.S.C. § 551(1). Its actions in promulgating regulations and the SFA Guidance, as well as its failure to act, and its policy of treating plans it believes are outside the Second Circuit differently, all qualify as "agency action" for purposes of 5 U.S.C. § 551(13).

37. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1303(f)(2)(C) because Plaintiffs' claims arise under the laws of the United States and this suit seeks appropriate equitable relief in an appropriate court. Declaratory relief is available pursuant to 28 U.S.C. § 2201.

38. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A) and (B) because the PBGC is headquartered in Washington, D.C., and the adoption of the relevant regulations and guidance, along with the processing of SFA applications, took place within this District.

39. Venue is also proper under 29 U.S.C. § 1303(f)(2)(C) because this Court is specifically authorized to hear claims for appropriate equitable relief against the PBGC.

40. The Excluded Plans have standing, because their ability to apply for and receive SFA funding has been unlawfully delayed and withheld, which has harmed the Excluded Plans and their participants.

## PARTIES

41. The PBGC is a United States government corporation that administers and enforces Title IV of ERISA, 29 U.S.C. §§ 1301–61, including a mandatory government pension insurance program for multiemployer defined benefit pension plans (the "Multiemployer Insurance Program").

42. Each of the Excluded Plans is a multiemployer defined benefit pension plan located outside the Second Circuit, or which the PBGC has not agreed is within the Second Circuit. Each is a "terminated" plan under § 4041A of ERISA, 29 U.S.C. § 1341a. Each of the Excluded Plans filed an application for SFA with the PBGC pursuant to 29 U.S.C. § 1432(f) before December 31, 2025. All but one have been relegated to the indefinite waitlist by the PBGC's regulations and

guidance, with some waiting since May 2025. None has been invited by the PBGC to submit a revised application, despite desiring to do so, and despite the PBGC inviting other plans lower on the waitlist to apply.

43. The Trustees of the Excluded Plans are employer, union, and independent representatives appointed to manage the operation and administration of their respective Excluded Plans, as well as the trusts containing their respective Excluded Plans' assets. The Trustees are "person[s]" under ERISA, 29 U.S.C. § 1002(9) and the APA, 5 U.S.C. § 551(2). They are fiduciaries within the meaning of 29 U.S.C. § 1303(f). They are plan sponsors under 29 U.S.C. § 1301(a)(10).

## FACTUAL ALLEGATIONS

### I. The PBGC's Multiemployer Insurance Program and Congress's Initial Efforts to Address Underfunding of MEPPs.

44. In 1974, Congress enacted ERISA to, among other things, "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). Congress, through ERISA, also established the PBGC and directed it to "provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries." *See* 29 U.S.C. § 1302(a)(2).

45. To help secure pension benefits, the PBGC operates the Multiemployer Insurance Program, which covers MEPPs.[2] *See* 29 U.S.C. §§ 1002(37), 1301(a)(3). Today, the

[2] PBGC, *How we operate*, https://www.pbgc.gov/about/operate (last visited Aug. 30, 2026); *See also* PBGC, *FY 2025 Annual Report* at 33–35 (Jan. 16, 2026), https://www.pbgc.gov/sites/default/files/documents/pbgc-annual-report-2025.pdf.

Multiemployer Insurance Program "protects about 11 million workers and retirees in about 1,300 private-sector, defined benefit pension plans."[3]

46. The Multiemployer Insurance Program is financed by annual insurance premiums paid by multiemployer plans and investment income. When a MEPP becomes insolvent and cannot pay full benefits, the PBGC provides financial assistance to the MEPP so it is able to continue to pay benefits up to a statutorily guaranteed minimum. 29 U.S.C. § 1431(a).

47. MEPPs were generally well funded until the early 2000s, when funding levels dropped due to market and labor changes.

48. In 2006, Congress passed the Pension Protection Act ("PPA"), which addressed multiemployer plan funding challenges. The PPA requires the trustees of plans and the relevant bargaining parties to take corrective action when their plans are deemed to be in "endangered" or "critical" status.

49. Under the PPA, a MEPP is deemed to be in critical status when it meets one of four "Critical Status" entry tests related to plan assets and liabilities. 29 U.S.C. § 1085(b)(2)(A).

50. The PPA requires MEPPs in critical status to adopt rehabilitation plans to improve the financial health of the plan and avoid, or at least delay, insolvency. 29 U.S.C. § 1085(a)(2).

51. Subsequent economic downturns had a devastating impact on many MEPPs. In 2008, many MEPPs suffered losses of 20% or more of their assets.

52. On June 25, 2010, Congress passed the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act ("PRA"), in part, to provide relief to multiemployer plans that experienced investment losses in 2008–2009.

---

[3] *How we operate*, supra note 2.

53. On December 16, 2014, Congress passed the Multiemployer Pension Reform Act of 2014 ("MPRA"). The MPRA created an additional category of financially troubled MEPPs referred to as "critical and declining status" plans. Under the statute, a plan is in critical and declining status if it is in critical status and "is projected to become insolvent" within a certain period. 29 U.S.C. § 1085(b)(6).

54. The MPRA also clarified that a multiemployer plan that enters critical status "shall remain" in critical status until the plan actuary certifies that the plan: (i) does not meet any of the Critical Status entry tests; (ii) "is not projected to have an accumulated funding deficiency for the plan year or any of the 9 succeeding plan years"; and (iii) "the plan is not projected to become insolvent . . . [in] any of the 30 succeeding plan years." 29 U.S.C. § 1085(e)(4)(B)(i).

## II. Congress Passes ARPA, Creating the SFA Program to Protect the Retirement Security of Participants in Multiemployer Plans.

55. Despite the PPA, PRA, and MPRA, the challenges facing some MEPPs, including the Excluded Plans, did not abate and were further exacerbated with time.

56. As more MEPPs were projected to become insolvent, the PBGC projected in 2020 that its own Multiemployer Insurance Program would become insolvent in 2026.[4]

57. In response to those projections and the COVID-19 pandemic, Congress passed ARPA in 2021, which included the SFA program.

58. The SFA program is distinct from the PBGC's Multiemployer Insurance Program.

59. The House of Representatives Committee on the Budget explained:

> [I]mplementing a special financial assistance program for the most financially troubled multiemployer plans and increasing PBGC premiums for multiemployer plans will (1) permit these plans to restore their solvency; (2) protect pension benefits of the participants and beneficiaries in these plans; and (3) lessen the

[4] PBGC, *FY 2020 Annual Report* at i (Dec. 9. 2020), https://www.pbgc.gov/sites/default/files/pbgc-annual-report-2020.pdf.

> financial impact of these plans upon the PBGC's multiemployer plan program.

H.R. Rep. No. 117-7, at 850 (2021) (available at https://www.congress.gov/117/crpt/hrpt7/CRPT-117hrpt7.pdf).

60. On July 5, 2022, the White House released a statement on the SFA program: "Thanks to [ARPA], ***every*** multiemployer pension plan that faced near-term insolvency and benefit cuts that receives [SFA] is projected to remain solvent through 2051, and for much longer."[5]

61. Among ARPA's many provisions is Title IX, § 9704, 135 Stat. 190, codified as 29 U.S.C. § 1432. It unambiguously requires the PBGC to provide SFA to MEPPs that apply and meet its eligibility requirements. *See* 29 U.S.C. § 1432(a)(1) (The PBGC "*shall* provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance." (emphasis added)).

62. Congress understood the exigency many MEPPs faced, and so imposed a time limit on the PBGC's deliberative process. It mandated that applications for SFA assistance

> shall be deemed approved unless the corporation notifies the plan within 120 days of the filing of the application that the application is incomplete, any proposed change or assumption is unreasonable, or the plan is not eligible under this section. Such notice shall specify the reasons the plan is ineligible for special financial assistance, any proposed change or assumption is unreasonable, or information is needed to complete the application.

*Id.* § 1432(g)).

63. Importantly, Congress understood the process could be iterative. It did not require the PBGC to deny applications that were incomplete or had other deficiencies. Instead, the statute

---

[5] White House, *FACT SHEET: President Biden Announces Historic American Rescue Plan Pension Relief for Millions of Union Workers and Retirees* (July 5, 2022), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2022/07/05/fact-sheet-president-biden-announces-historic-american-rescue-plan-pension-relief-for-millions-of-union-workers-and-retirees/ (emphasis added).

leaves open the possibility that the PBGC could work with plans and allow them to supplement their applications following a notice of deficiency. That explains, at least in part, why Congress gave the PBGC until September 2030 to pay SFA even though all revised applications had to be submitted by December 2026.

64. Even if an application is denied, a "plan may submit a revised application." *Id.* As with the initial application, a revised application is deemed approved after 120 days unless the PBGC appropriately notifies the plan that the application is deficient and provides an explanation. *Id.*

65. Eligibility criteria for SFA are set forth in the statute. *Id*. § 1432(b). A multiemployer defined benefit plan is eligible for SFA if:

> (A) the plan is in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan year beginning in 2020 through 2022;
>
> (B) a suspension of benefits has been approved with respect to the plan under section 1085(e)(9) of this title as of March 11, 2021;
>
> (C) in any plan year beginning in 2020 through 2022, the plan is certified by the plan actuary to be in critical status (within the meaning of section 1085(b)(2) of this title), has a modified funded percentage of less than 40 percent, and has a ratio of active to inactive participants which is less than 2 to 3; or
>
> (D) the plan became insolvent for purposes of section 418E of Title 26 after December 16, 2014, and has remained so insolvent and has not been terminated as of March 11, 2021.

*Id.* § 1432(b)(1).

66. All applications for SFA must have been submitted "no later than December 31, 2025, and any revised application for special financial assistance shall be submitted no later than December 31, 2026." *Id.* § 1432(f).

## III. Rather Than Faithfully Implement ARPA, the PBGC Created Artificial Barriers to Plans Seeking SFA, Including a Waitlist with No End That Is Contrary to ARPA.

### A. The Authority Congress Granted the PBGC Was Limited.

67. Congress's first, straightforward command as to SFA is that the PBGC "*shall* provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance." *Id.* § 1432(a)(1) (emphasis added).

68. To that end, Congress required that the PBGC "issue regulations or guidance setting forth requirements for special financial assistance applications." *Id.* § 1432(c).

69. Congress, however, limited what those regulations and guidance could require to ensure applications would not be bogged down in bureaucratic minutiae. Specifically, Congress commanded the PBGC to:

> (1) limit the materials required for a special financial assistance application to the minimum necessary to make a determination on the application;
>
> (2) specify effective dates for transfers of special financial assistance following approval of an application, based on the effective date of the supporting actuarial analysis and the date on which the application is submitted; and
>
> (3) provide for an alternate application for special financial assistance under this section, which may be used by a plan that has been approved for a partition under section 1413 of this title before March 11, 2021.

*Id*. Those requirements limit the scope of the regulations and guidance that Congress authorized the PBGC to issue regarding the filing of SFA applications.

70. ARPA also allowed the PBGC, through regulation, to specify "that, during a period no longer than the first 2 years following March 11, 2021, applications may not be filed by an eligible multiemployer plan" absent certain criteria. *Id.* § 1432(d).

71. Other than the two-year period under § 1432(d), and the deadlines set forth in 29 U.S.C. § 1432(f), no other provision of Section 1432 limits when applications for SFA may be filed, or allows the PBGC to limit applications.

72. ARPA also authorized the PBGC to impose "reasonable conditions" on recipients of SFA relating to certain specified matters. 29 U.S.C. § 1432(m)(1). But ARPA did not authorize the PBGC to modify or expand upon the eligibility criteria. *See* 29 U.S.C. § 1432(b) (containing an exclusive list of eligibility criteria without authorizing the PBGC to issue related regulations), (c) (giving the PBGC authority to issue "regulations or guidance setting forth requirements for special financial assistance *applications*" (emphasis added)).

73. Except as provided in 29 U.S.C. § 1432(d), ARPA does not give the PBGC the authority to defer the submission and consideration of applications or revised applications. And the authority in 29 U.S.C. § 1432(d) only authorized the PBGC to limit the MEPPs that could apply for SFA through March 10, 2023.

**B. The PBGC Issued Regulations Contrary to Law and in Excess of its Delegated Authority.**

74. On July 12, 2021, the PBGC issued interim SFA regulations under 29 C.F.R. § 4262. Special Financial Assistance by PBGC, 86 Fed. Reg. 36598-01 (July 12, 2021) (to be codified as 29 C.F.R. pts. 4000 and 4262). It issued final regulations on July 8, 2022, with an effective date of August 8, 2022. Special Financial Assistance by PBGC, 87 Fed. Reg. 40968, 40968 (July 8, 2022) (to be codified as 29 C.F.R. pt. 4262).

75. Those regulations specified when and how to file SFA applications. *See* 29 C.F.R. §§ 4262.6-.10. Before March 11, 2023, those regulations only allowed plans that were facing imminent insolvency, had suspended benefits, or met certain size requirements to submit applications, in accordance with 29 U.S.C. § 1432(d)(1). *See id.* § 4262.10(d)(2).

76. But the PBGC regulations went further. They explicitly limited applications even after March 11, 2023 to avoid the statutorily mandated 120-day period. *See id.* § 4262.10(d)(1)(i). They provided that the "number of applications accepted for filing will be limited in such manner that, in PBGC's estimation, each application can be processed within 120 days." *Id*. The only exception to that limitation appears to be for plans that met certain emergency criteria, which the PBGC could choose to accept (or block) at its discretion. *See id.* § 4262.10(f).

77. Rather than provide a framework in which any plan could apply for SFA, the PBGC's regulations specify that an SFA application will only be considered filed only if it:

> meets the applicable requirements in paragraph (d) of this section, including that it can be accommodated in accordance with the processing system described in paragraph (d)(1) of this section . . . . Otherwise, the application will not be considered filed and PBGC will notify the applicant that the application was not properly filed, and that the application must be filed in accordance with the processing system and instructions on PBGC's website at www.pbgc.gov.

29 C.F.R § 4262.10(e).

78. Congress's express grant of authority to the PBGC to limit applications for a two-year period indicates that the PBGC did not have the authority to limit SFA applications indefinitely, as it has done.

### C. The PBGC Blocked the Filing of SFA Applications and Creates an Unauthorized Waitlist to Nowhere.

79. The PBGC's guidance, issued on its website, states that all "application[s] . . . must be submitted to PBGC electronically through PBGC's e-Filing Portal."[6] However, the e-filing portal *does not allow* plans to submit applications—the PBGC "temporar[ily] clos[ed]" the portal.

---

[6] PBGC, *General Instructions For Multiemployer Plans Applying For Special Financial Assistance*, https://www.pbgc.gov/sites/default/files/sfa/sfa-filing-instructions.pdf (last updated Mar. 24, 2025).

On information and belief, that "temporary" closure has been in effect since March 11, 2023, and has blocked plans from filing initial or revised SFA applications without the PBGC's permission.

80. The PBGC's SFA Guidance, rather than allowing applicants to file an application, directs them to email the PBGC to be placed on a waiting list. An applicant may only submit an application through the e-filing portal once it is notified it "will be allowed to apply."[7]

81. Nowhere does ARPA authorize the PBGC to limit the number of applicants, nor does it permit a waitlist for applicants after the initial two-year period.

82. The practical effect of the PBGC's regulations is that an eligible MEPP could not submit an application for SFA before the statutory deadline of December 31, 2025, unless the PBGC authorized that application.

83. The PBGC did, however, allow applicants to submit what the regulations refer to as "lock-in applications," *id.* § 4262.10(g), a term that is found nowhere in the statute. The regulations authorize plans to submit a partial application containing some, but not all, of the information otherwise required of applications and "locking in" the SFA measurement date for purposes of the benefits calculations.

84. Notably, the waitlist process and the lock-in applications are two separate and distinct systems. A MEPP could have been on the waitlist without filing a lock-in application, and it could have filed a lock-in application without placing itself on the waitlist. In that case, however, the MEPP would have to wait until the waiting list was exhausted before filing its revised application for SFA.

85. The regulations provide that a lock-in application constituted a plan's initial application, which was then "denied for incompleteness under § 4262.11(a)(2)(i)." *Id.*

[7] *SFA application guidance for non-priority group plans*, supra note 1.

§ 4262.10(g)(4). In other words, the PBGC forbade a lock-in application from being a complete application and required by regulation that it be summarily denied for incompleteness.[8]

86. The upshot of the PBGC regulations is that if a plan submitted a compliant lock-in application, that plan would have until December 31, 2026 to submit a revised application for SFA benefits under 29 U.S.C. § 1432(f).

87. The PBGC's regulations, however, block applicants who submitted a lock-in application from filing a revised application until the PBGC gives the applicant permission to do so by operation of the waitlist. *See* 29 C.F.R. § 4262.10(e).

88. If the PBGC does not allow a plan otherwise eligible for SFA who has submitted a lock-in application to submit a revised application by December 31, 2026, then that plan will have no opportunity to apply for SFA because it will be statutorily ineligible to submit a revised application after that date. *See* 29 U.S.C. § 1432(f).

89. A total of 198 plans have been placed on the waitlist, of which 99 were added on May 13, 2023—the first day plans could join the waitlist. Since then, the PBGC has only processed or begun processing 131 applications, leaving approximately 67 on the waitlist as of the date of filing.[9]

90. The PBGC's scheme looks nothing like what Congress legislated, or intended.

---

[8] For avoidance of doubt, the excluded plans do not challenge the PBGC's authority to allow the submission of lock-in applications under 29 C.F.R. § 4262.10(g), or to treat lock-in applications as the initial application that applicants had to submit by December 31, 2025, under 29 U.S.C. § 1432(f).

[9] *See* PBGC, *Special Financial Assistance applications*, https://www.pbgc.gov/arp-sfa/applications (last visited Aug. 30, 2026) and https://www.pbgc.gov/sites/default/files/documents/sfa-application-status-current.xlsx (last updated Aug. 28, 2026).

91. Congress's process, under 29 U.S.C. § 1432(g), looks like this:




92. The PBGC's scheme looks like this:




93. The PBGC's restrictive consideration of applications is not based on a limited pool of available funds. The statute does not limit the appropriation for SFA—the PBGC admitted as much during oral argument on December 12, 2024 in *Bakery*. The PBGC's FAQs confirm that "the statute and PBGC's regulation define the amount of SFA each eligible plan may receive, but

the law does not cap the overall amount of SFA that PBGC may pay."[10] The PBGC's regulations confirm that, unlike the standard Multiemployer Insurance Program, which caps guaranteed benefits, there is no such restriction on SFA funding. 29 C.F.R. § 4262.17.

## IV. The Excluded Plans Have Not Been Allowed to Fully Apply for SFA, in Violation of the Statute and the PBGC's Own Regulations and Guidance.

94. In compliance with 29 C.F.R. § 4262.10(g), the Excluded Plans submitted lock-in applications that satisfy the requirements of the regulations. The Excluded Plans also placed themselves on the waitlist, in accordance with the SFA Guidance.[11]

95. The below table lists the date each Excluded Plan was added to the waitlist and filed a lock-in application. It also lists the date by which the PBGC was required by statute to adjudicate the initial application, had the PBGC accepted a full application, rather than unlawfully restricting those applications and then summarily denying them. And it lists the number of days that have passed since each excluded plan filed its lock-in application:

| Excluded Plan | Date Placed on Waiting List | Initial (Lock-In) Application Date | Date on Which PBGC Should Have Adjudicated | Days from Lock-In to September 2, 2026 |
|---|---|---|---|---|
| Beverage & Brewery Drivers Local Union No. 67 Pension Fund | Request pending | 12/19/2025 | 4/18/2026 | 257 |
| Sports Arena Employees' Local No. 137 Retirement Plan | 4/30/2025 | 12/18/2025 | 4/17/2026 | 258 |
| Chicago Foundry Workers Pension Plan | 8/11/2025 | 12/8/2025 | 4/7/2026 | 268 |

---

[10] *See* PBGC, *American Rescue Plan Act FAQs*, (last updated June 9, 2026) https://www.pbgc.gov/arp-sfa/faqs.

[11] One filed an emergency application and then withdrew it following consultation with the PBGC, and so an additional lock-in application was not necessary. One Excluded Plan emailed the PBGC to be added to the waitlist, and also requested to file an emergency application, but the PBGC simply ignored both requests.

| | | | | |
|---|---|---|---|---|
| Concession & Program Employees Local # 468 Pension Plan | 6/9/2025 | 12/29/2025 | 4/28/2026 | 247 |
| CTDU Partition Pension Plan | 12/22/2025 | 12/26/2025 | 4/25/2026 | 250 |
| Defined Benefit Plan of the Operative Plasterers' and Cement Masons' International Association Local Union 394 Pension Trust Fund | 8/26/2026 | 11/29/2022[12] | 3/29/2023 | 1,373 |
| Employer – Local No. 375 Pension Plan | 5/9/2025 | 6/30/2025 | 10/28/2025 | 429 |
| Employers-Local 1167 Joint Pension Fund | 8/21/2025 | 12/9/2025 | 4/8/2026 | 267 |
| Greater St. Louis Service Employees Pension Trust | 9/21/2025 | 9/29/2025 | 1/27/2026 | 338 |
| IBEW 1919 Pension Plan | 6/9/2025 | 6/9/2025 | 10/7/2025 | 450 |
| Industrial Relations Council of Furniture Manufacturers in Southern California and Cabinet Makers, Millmen, and Industrial Carpenters Local 721 Pension Trust | 11/25/2025 | 11/28/2025 | 3/28/2026 | 278 |
| Iron Workers Local 473 Pension Plan | 5/16/2025 | 7/17/2025 | 11/14/2025 | 412 |
| Local 400 Food Terminal Employees' Pension Plan | 7/16/2025 | 7/31/2025 | 11/28/2025 | 398 |
| Local 422 Pension Trust Fund | 6/23/2025 | 7/30/2025 | 11/27/2025 | 399 |
| Operating Engineers Local 800 and Wyoming Contractors Association, Inc. Pension Plan for Wyoming | 10/28/2025 | 12/17/2025 | 4/16/2026 | 259 |
| Oregon Printing Industry Pension Trust | 6/4/2025 | 9/30/2025 | 1/28/2026 | 337 |
| Painters and Allied Trades Paint Makers Pension Plan | 10/16/2025 | 11/26/2025 | 3/26/2026 | 280 |
| St. Louis Graphic Arts Pension Fund | 9/19/2025 | 9/24/2025 | 1/22/2026 | 343 |
| UFCW Pension Plan of Northeastern Pennsylvania | 1/14/2026 | 12/17/2025 | 4/16/2026 | 259 |
| UFCW, Local 1776KS, Western Division and Employers Pension Plan | 6/19/2026 | 12/17/2025 | 4/16/2026 | 259 |

[12] The PBGC's website shows a submitted and withdrawn application, rather than a lock-in application.

| | | | | |
|---|---|---|---|---|
| USW District 10 Local 286 Pension Plan | 12/1/2025 | 12/1/2025 | 3/31/2026 | 275 |
| Wyoming Carpenters Pension Fund | 6/24/2025 | 12/18/2025 | 4/17/2026 | 258 |

96. Each of the Excluded Plans meets at least one of the eligibility criteria under 29 U.S.C. § 1432(b).

97. Even though the Excluded Plans have complied with the PBGC's regulations and guidance, the PBGC has not allowed the Excluded Plans to submit complete revised applications for SFA.

98. On average, Excluded Plans have been sitting on the waitlist for 347 days, and 311 days have passed since they submitted lock-in applications.

99. Had the PBGC not instituted its unlawful waitlist scheme, each of the Excluded Plans would have had the ability to apply, receive a PBGC adjudication on the merits, and submit multiple revised applications, if necessary.

100. Congress, by establishing an initial application deadline of December 31, 2025, and a revised application deadline of December 31, 2026, contemplated that plans would have multiple opportunities to revise their applications if the PBGC adjudicated them within the required 120-day period.

101. The PBGC has taken the position that, because the Excluded Plans are MEPPs that have previously been terminated, they are not eligible for SFA under 29 U.S.C. § 1432(b)(1)(A).

102. That position has been rejected by the Second Circuit. On April 29, 2025, the court held that terminated plans were eligible for SFA in a case challenging the PBGC's denial of a plan's application. *See Bakery*, 136 F.4th at 29–31. The court ordered that judgment be entered in favor of the Fund, that the PBGC's denial of the application be vacated, and that the PBGC reconsider the application.

103. The PBGC subsequently sought a writ of certiorari from the Supreme Court, which was denied. 224 L. Ed. 2d 844 (2026).

104. Despite the loss in the Second Circuit and the Supreme Court's denial of its petition, the PBGC has declined to follow *Bakery*'s holding for any plan located in other jurisdictions.

105. Following the May 18, 2026 denial of the *Bakery* Cert Petition, the PBGC began inviting terminated plans it believed to be located within the Second Circuit to file revised SFA applications, skipping over plans it believes to be located elsewhere that were higher on the waitlist. On information and belief, as of this filing, the PBGC has invited nearly all MEPPs it believes are located in the Second Circuit to apply, skipping over plans in other circuits, including the Excluded Plans.

106. That contravenes what the PBGC told the Excluded Plans, and other plans. In responding to requests to be added to the waitlist, the PBGC stated that it would invite plans to submit revised applications when they made it to the top of the waitlist, which was determined chronologically.

107. That also contravenes the PBGC's own waitlist guidance. Except for emergency applications, the SFA Guidance provides that "[a]ny applications submitted outside the order of the waiting list will not be considered filed (see [29 C.F.R.] § 4262.10(e))."[13] Other than emergency applications, neither the SFA Guidance nor the regulations provide any other exceptions allowing the PBGC to bypass the waitlist order.

108. Notably, the PBGC has used discretion it granted itself regarding whether to accept emergency filings to block terminated MEPPs from filing emergency applications. When an

[13] *See* PBGC, *Special Financial Assistance applications*, https://www.pbgc.gov/arp-sfa/sfa-applications (last visited Aug. 31, 2026), and https://www.pbgc.gov/sites/default/files/documents/sfa-application-status-current.xlsx (last updated Aug. 28, 2026).

actuary of one of the Excluded Plans, Iron Workers Local 473 Pension Fund, asked the PBGC in July 2025 whether terminated MEPPs that met the emergency criteria could file emergency applications, the PBGC said no.

109. The Beverage and Brewery Drivers Local Union No. 67 Pension Fund was similarly stonewalled. On June 25, 2025, following a conference with the PBGC, it submitted a request to file an emergency application for SFA. The PBGC acknowledged receipt, but otherwise never responded to that request.

110. ARPA does not authorize the PBGC to refuse to accept applications from MEPPs merely because the PBGC believes those plans are ineligible for SFA. If the PBGC believes applicants are ineligible, ARPA requires that the PBGC deny those applications. *See* 29 U.S.C. § 1432(g) (providing that the PBGC should provide notice of the reasons why a plan is found ineligible for SFA). The applicants can then challenge whether the denial was proper. *See* 5 U.S.C. § 706(2); 29 U.S.C. § 1303(f). The PBGC's actions put the cart before the horse, prejudging the merits of the applications, and attempting to preclude review of its non-decisions.

111. In fact, the PBGC has repeatedly attempted to avoid review of its decisions. Rather than deny applications, the PBGC has notified plans it would do so, and plans have voluntarily "withdrawn" their applications to avoid denial and being pushed further back on the waitlist. For instance, one Excluded Plan, the Defined Benefit Plan of the Operative Plasterers' and Cement Masons' International Association Local Union 394 Pension Trust Fund, submitted an application for SFA in 2022, but was told the PBGC would deny it based on its status as a terminated plan, leading the plan to voluntarily withdraw the application.

112. The PBGC incentivized plans to withdraw applications by allowing those plans to submit up to two revised applications to the PBGC by email without going through the waitlist

process. Any plan whose application is denied, however, would be forced to go to the end of the waitlist. *See* SFA Guidance. That cudgel allowed the PBGC to avoid judicial review of denials.

113. To date, the PBGC has approved approximately 167 applications. Approximately 108 were approved only after being withdrawn at least once. The PBGC took, on average, 98 days to consider an application before it was withdrawn. It then took, on average, another 105 days to consider the revised application before approving SFA. In other words, for about two thirds of the applications it has approved, the PBGC took an average of more than 200 days.

114. The PBGC has made clear it will not accept revised applications for SFA unless it believes the applicant is within the Second Circuit.

115. When an actuary for Excluded Plan Sports Arena Employees Local No. 137 Retirement Plan spoke with a PBGC representative in June 2026, the PBGC said it would not allow terminated plans outside the Second Circuit to apply. The actuary described the Plan's connections to the Second Circuit, and the PBGC representatives stated they did not believe the plan was within the Second Circuit.

116. The actuary asked whether the Plan could consult with the PBGC to prepare an application and suggested the PBGC could simply deny the application if it determined the plan was outside the Second Circuit. The PBGC's representatives refused, citing opposition to using PBGC resources on applications that it would deny. The actuary said that, even without a consultation, the plan wished to submit its application, and the PBGC could deny it, which would allow the plan to seek judicial review. The PBGC's representatives stated again that the PBGC would not accept applications from plans outside the Second Circuit.

117. In other words, the PBGC is not only restricting the filing of applications to plans it believes are within the Second Circuit, it is also imposing another hurdle on plans to prove they

fall within the Second Circuit, before they can even apply. And the PBGC is refusing to help these plans prepare their applications before they are satisfied the plan falls within the Second Circuit. There is no statutory or other basis for the PBGC's obstructionism.

## V. The Excluded Plans Have Been Harmed—If They Cannot Submit Revised SFA Applications, the Impact to Participants Will Be Severe.

118. Among the Excluded Plans, eight are insolvent plans that have already fully exhausted their assets. Those plans have continued to pay participant benefits though assistance received from the PBGC Multiemployer Insurance Program. But the PBGC Multiemployer Insurance Program provides far less than SFA, and insolvent plans have had to cut participant benefits significantly.

119. For example, CTDU Partition Pension Fund, which has been insolvent since 2010, had to reduce pensioner benefits by 26%, and the benefits promised to then-inactive but vested participants by an average of 47%. And individual cases can be substantially worse. A sampling of four participants in the Beverage and Brewery Drivers Local Union No. 67 Pension Fund showed benefit reductions of more than 54%.

120. Three Excluded Plans are also expected to become insolvent within the next year. As an example, Wyoming Contractors Association, Inc. Pension Plan will then need to make cuts of around 42% to the average benefits payments to all participants and beneficiaries.

121. Even those 11 Excluded Plans for whom insolvency is several years away have to reckon with severe cuts if they do not receive SFA. For example, the Concession & Program Employees Local #468 Pension Plan estimates that it will become insolvent sometime in 2029 or 2030, at which point it will have to reduce the average annual pension benefit from $40,200 to $29,100, an $11,100 cut. Further, inactive vested participants over the age of 65 could see their benefits cut from an average annual pension of $59,700 to $37,100, a $22,600 cut on average.

122. The cumulative amounts of SFA the insolvent plans would also be entitled illustrates the depth of the harm the PBGC is forcing on the Excluded Plans. Although the exact numbers are uncertain and would be subject to submission of full SFA applications, the PBGC in its *Bakery* Cert Petition cited a PBGC risk advisory that estimated that the 123 terminated MEPPs could collectively be entitled to approximately $6 billion in SFA. *See* 2025 WL 3681858, at *24–25 (citing Nicholas J. Novak, Inspector General, PBGC, *Risk Advisory: Recent Court of Appeals Ruling May Cost Taxpayers Approximately $6 Billion More in Special Financial Assistance Than Originally Projected* (June 16, 2025), https://www.oversight.gov/sites/default/files/documents/reports/2025-06/SR-2025-09.pdf). Of that $6 billion, $2.5 billion would be for plan benefits and administrative expenses. *Risk Advisory*, at 5.[14] That means the average MEPP would be entitled to $20.32 million in SFA to provide benefits and pay plan administrative expenses. Assuming the Excluded Plans represent an average cross section, they collectively are entitled to almost $450 million for benefits and plan expenses in administering those benefits for their more than 25,000 participants and beneficiaries.

123. Retirees in these plans, who generally come from blue collar industries with modest wages, have had to or will have to adjust their lifestyles to pension benefits significantly below promised levels. Yet many participants, the average age of whom in several plans is over 75, lack the ability to obtain any new employment or earn additional income.

124. If the Court grants relief, and those plans are able to obtain the approximately $450 million in SFA to which they are entitled, benefits will be restored to the pre-insolvency levels.

[14] The rest would actually flow right back to the PBGC. When insolvent plans receive payments through the Multiemployer Insurance Program, they issue a promissory note to the PBGC. The infusion of SFA into the plans would require them to repay their promissory notes. And so, the SFA payments would bolster the PBGC's signature MEPP insurance program.

That will include back payments, but those back payments cannot restore the opportunities, and potentially basic necessities, that were sacrificed by retirees and survivors due to the reduced retirement benefits.

125. Each month that SFA is unlawfully delayed unnecessarily compounds these pensioners' suffering. While retirees can be made "whole" financially, the harm due to missed opportunities and substandard living conditions can never be undone.

126. The PBGC's unlawful delay of SFA applications causes even more pronounced harm. ARPA provides that plans receiving SFA will generally restore past benefit cuts retroactively, but only for retirees and beneficiaries who are alive and receiving benefits at the time SFA is paid. *See* 29 U.S.C. § 1432(k)(2). If a retiree dies before SFA is paid, their survivors receive nothing. Thus, every day of delay risks a participant or beneficiary dying and losing out on the benefits they would have received and passed on.

127. Further, the PBGC's actions jeopardize the ability of the Excluded Plans to receive SFA for their more than 25,000 participants and beneficiaries, even though they have patiently been waiting for months for permission to file revised applications for SFA. That is because the statutory deadline for filing the revised applications is December 31, 2026. *See* 29 U.S.C. § 1432(f).

128. The PBGC has also thrown up other impermissible barriers to applications. The PBGC's guidance provides that insolvent MEPPs receive financial assistance from the PBGC to pay for "reasonable administrative expenses" of the plan, including "legal and attorney fees, actuarial fees, [and] accountant fees."[15] Yet the PBGC has refused to allow plans to use those

[15] PBGC, *Multiemployer Insolvent Plan administrative expense FAQs*, https://www.pbgc.gov/employers-practitioners/multiemployer/terminated/plan-insolvency-faqs (last updated Feb. 25, 2026).

funds to apply for SFA, despite the massive positive impact SFA would have on the plans and the participants and beneficiaries. There is no basis for the PBGC to deny plans the funds necessary to apply for such benefits—other than the PBGC's own apparent distaste for following Congress's instruction to provide SFA as smoothly and quickly as possible.

129. The Excluded Plans have waited patiently, and far beyond what ARPA. They have acted in good faith by reaching out to the PBGC and asking for updates, and asking to apply. The PBGC has done just the opposite. It has schemed, and blocked, and delayed. Time has run out, and only the Court can stop the abuse—otherwise, the PBGC will run out the clock and deny Congress's promised relief to thousands of retirees and those who depend on them.

**COUNT I**

**Violation of the APA, 5 U.S.C. § 706(2)**

**(Unlawful Agency Action – 29 C.F.R. § 4262.10(a), (d) and (e); SFA Guidance)**

130. The Trustees incorporate the foregoing paragraphs of this complaint by reference as though set forth in full.

131. Pursuant to the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law [or] . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A), (C).

132. Congress provided that applications shall be deemed approved unless the PBGC denied an application, including a revised application, within 120 days of its filing. *See* 29 U.S.C. § 1432(g). It allowed the PBGC a limited period during which it could restrict applications for SFA. *See* 29 U.S.C. § 1432(d)(1).

133. Congress gave the PBGC authority to issue guidance and regulations setting forth requirements for SFA applications, but it did not authorize the PBGC to limit applications and prevent otherwise eligible plans from applying from March 11, 2023 onwards. Rather, Congress

expressly required that the PBGC "shall provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance." 29 U.S.C. § 1432(a)(1). Congress also required the PBGC to process all applications within 120 days. *Id*. § 1432(g).

134. Yet 29 C.F.R. § 4262.10(a), (d)(1) and (e), the preamble in subsection (d), and the PBGC's guidance related to the waitlist for SFA applicants limit the ability of the Excluded Plans, who are eligible for SFA, to submit revised applications for SFA, and they nullify Congress's command that the PBGC process applications within 120 days or that the application otherwise is deemed approved.

135. The PBGC's regulations and guidance are contrary to law and exceed the regulatory authority granted to the PBGC under 29 U.S.C. § 1432. They also fundamentally contradicts the PBGC's core function (written into the name of the Corporation) of guaranteeing pension benefits by risking insolvency of the Excluded Plans, which are eligible for SFA.

**COUNT II**

**Violation of the APA, 5 U.S.C. § 706(1)**

**(Unlawfully Withheld or Unreasonably Delayed Agency Action – Permission to File Revised Applications)**

136. The Trustees incorporate the foregoing paragraphs of this complaint by reference as though set forth in full.

137. Pursuant to the APA, courts "shall [ ] compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

138. Even if 29 C.F.R. § 4262.10(a), (d)(1) and (e), the preamble in subsection (d), and the PBGC's waitlist are lawful, the PBGC has a legal duty not to unlawfully withhold or unreasonably delay agency action.

139. Congress required that the PBGC "shall provide [SFA]" to all eligible multiemployer pension plans. *See* 29 U.S.C. § 1432(a)(1). Congress also gave MEPPs the right to submit applications and revised applications for SFA. *Id.* § 1432(f), (g)

140. The PBGC's inaction in leaving the Excluded Plans on the waitlist jeopardized their ability to file revised applications for SFA by the statutory deadline of December 31, 2026. *See* 29 U.S.C. § 1432(f).

141. This risk is not hypothetical, as the PBGC's waitlist prevented some plans from submitting initial applications for SFA by the statutory deadline of December 31, 2025, unless they used the lock-in application process.

142. The PBGC's inaction further jeopardizes the Excluded Plans' ability to submit revised applications more than 120 days before the statutory deadline of December 31, 2026. If the Excluded Plans cannot submit their applications more than 120 days before the deadline, and if the PBGC takes 120 days to process these applications, then the Excluded Plans cannot revise their applications should the PBGC choose to find "deficiencies" in them, absent this Court's intervention. Given the PBGC's past practice, that is not an academic concern—even when it has allowed plans to apply, it has routinely required multiple reapplications. That undermines the Excluded Plans' right to submit revised applications that address any deficiencies identified by the PBGC. *See* 29 U.S.C. § 1432(g).

143. There is no reason to delay the Excluded Plans from filing their revised applications for SFA. To the extent that the PBGC believes they cannot process the revised applications for SFA in time, Congress has ordered that a failure to provide a reasoned justification within 120 days shall mean the applications are deemed approved. *See* 29 U.S.C. § 1432(g). In other words,

Congress intended for SFA applications to be granted unless the PBGC found a good reason to deny them. The PBGC's regulatory scheme flips that presumption on its head.

144. By denying the Excluded Plans the ability to even submit revised SFA applications, and given the fast approaching statutory deadline of December 31, 2026, the PBGC is planning to deny meritorious applications due to administrative delay, causing the Excluded Plans irreparable harm from the loss of SFA. That risks the health and welfare of thousands of the Excluded Plans' participants who depend on their pensions for their livelihood and who will face severe economic hardships without SFA.

**COUNT III**

**Violation of the APA, 5 U.S.C. § 706(2)**

**(Arbitrary and Capricious Agency Action – Leapfrogging Plans Higher Up the Waitlist)**

145. The Trustees incorporate the foregoing paragraphs of this complaint by reference as though set forth in full.

146. The PBGC has issued the SFA Guidance, which is binding on the Excluded Plans and has legal consequences as it prevents them from submitting revised applications for SFA.

147. The SFA Guidance also provides that "[a]ny applications submitted outside the order of the waiting list will not be considered filed (see [29 C.F.R.] § 4262.10(e))."

148. Yet the PBGC has begun instructing applicants within the Second Circuit to prepare, and file, revised applications for SFA. The PBGC has also begun accepting revised applications from plans located within the Second Circuit, leapfrogging over plans located elsewhere.

149. Neither ARPA, nor the PBGC's regulations, nor the SFA Guidance suggest the PBGC can disallow submission of revised applications from plans that it believes are less likely to be eligible for SFA.

150. The PBGC's decision to allow plans it believes are within the Second Circuit to skip ahead of Excluded Plans located elsewhere risks them being unable to submit revised applications. It also risks the Excluded Plans not being able to submit further revised applications that address any deficiencies identified by the PBGC. *See* 29 U.S.C. § 1432(g); 29 C.F.R. § 4262.11(a).

151. Nor is there any basis for the PBGC to treat plans in the Second Circuit differently from outside that region. ARPA does not contemplate any such distinction, and the Supreme Court has denied certiorari in *Bakery*, meaning there is no reason for the PBGC to apply a different standard for terminated plans in other circuits.

152. The PBGC has acted arbitrarily and capriciously in ignoring its own binding guidance to allow plans to submit revised applications based on factors not contemplated by ARPA, the PBGC's regulations, or the SFA Guidance, causing harm to the Excluded Plans. And it has acted arbitrarily and capriciously in treating plans differently based on their location.

**COUNT IV**

**Violation of ERISA, 29 U.S.C. § 1303(f)**

**(Adverse PBGC Action - Blocking Submission of Revised Applications)**

153. The Trustees incorporate the foregoing paragraphs of this complaint by reference as though set forth in full.

154. Pursuant to 29 U.S.C. § 1303(f)(1), "any person who is a plan sponsor, fiduciary, employer, contributing sponsor, member of a contributing sponsor's controlled group, participant, or beneficiary, and is adversely affected by any action of the [PBGC] with respect to a plan in which such a person has an interest" may bring a civil action against PBGC for "appropriate equitable relief." *Id.*

155. The Excluded Plans have been harmed by the PBGC's unlawful actions in issuing 29 C.F.R. § 4262.10(a), (d)(1), and (e), the preamble to subsection (d), creating the waitlist, and denying them the ability to submit their revised applications for SFA in a timely fashion.

156. Even the delay in allowing the Excluded Plans to submit their revised applications for SFA has caused considerable harm insofar as it has left thousands of participants in the solvent Excluded Plans uncertain about their economic futures. And for the insolvent Excluded Plans, their participants have continued to have to go without their fully promised pensions, risking their health and welfare, and imposing severe economic hardships.

157. The Excluded Plans are entitled to appropriate equitable relief to remedy these harms.

**PRAYER FOR RELIEF**

WHEREFORE, the Trustees respectfully request that this Court enter judgment against PBGC and award the following relief:

a) Order that the PBGC shall not deny any application from an Excluded Plan on the ground that such plan has been terminated;

b) Vacate 29 C.F.R. § 4262.10(a), (d)(1), and (e), the preamble to subsection (d), the SFA Guidance, the PBGC's waitlist, and any PBGC decisions to the extent they prevent the Excluded Plans from submitting revised applications for SFA or prejudge the Excluded Plans' eligibility for SFA as terminated plans;

c) Enjoin the PBGC from blocking the Excluded Plans from submitting revised applications for SFA pursuant to 29 C.F.R. § 4262.10(a), (d), and (e) and the PBGC's waitlist;

d) Order the PBGC to allow the Excluded Plans to submit revised SFA applications by the statutory deadline;

e) Order that the PBGC approve each Excluded Plan's application, or otherwise notify the plan of "the reasons the plan is ineligible for special financial assistance, any proposed change or assumption is unreasonable, or information is needed to complete the application," 29 U.S.C. § 1432(g);

f) Order that, if the PBGC does not approve or provide such notice within 120 days, the application shall be deemed approved, 29 U.S.C. § 1432(g);

g) Order that the PBGC not deny any application for SFA by an Excluded Plan unless the PBGC has given that plan the ability to file clarifying and additional information in support of its application to address any deficiencies the PBGC identifies, and the plan acknowledges in writing that no further information is available to address additional deficiencies;

h) Order that such clarifying and additional information shall not be deemed a new "revised" application under ARPA or the PBGC's regulations;

i) Alternatively, order the PBGC to authorize the Excluded Plans to submit revised applications for SFA, notwithstanding the waitlist, given the PBGC's unreasonable delay in removing the Excluded Plans from the waitlist;

j) Alternatively, enter an injunction under 5 U.S.C. § 705 preserving the Excluded Plans' right to submit revised applications for SFA and, if those applications are denied, to have sufficient time to submit further revised applications upon receipt of the PBGC's reasons for the denials;

k) Alternatively, order that the PBGC process each Excluded Plan's application within 60 days of receipt, and either approve or provide a notice of incompleteness or other deficiencies along with clear instructions on how to rectify those deficiencies;

l) Order the PBGC to otherwise expedite its consideration of applications by the Excluded Plans;

m) Order the PBGC to work cooperatively with each Excluded Plan, to the extent any plan requests consultation with the PBGC, to address actuarial assumptions and other material terms, as contemplated by 29 C.F.R. § 4262.10(h);

n) In the alternative, suspend the deadline of December 31, 2026 as to revised applications by the Excluded Plans;

o) In the alternative, declare that the PBGC's impermissible delays and restrictions have violated Congress's 120-day mandate to conduct good faith reviews, and that therefore the Excluded Plans' initial applications are deemed approved, and further order that the PBGC shall work with each Plan to determine the amount of SFA relief to which each Plan is entitled;

p) Declare that expenses related to this lawsuit and application for SFA benefits constitute reasonable administrative expenses for purposes of the Multiemployer Insurance Program, and that insolvent Excluded Plans may use such funds for those purposes;

q) Award the Excluded Plans attorney's fees and costs incurred in connection with this litigation; and

r) Grant any other relief that the Court deems just and proper.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Lars C. Golumbic*
Lars C. Golumbic, No. 452143
Samuel I. Levin, No. 1044774
Shai D. Bronshtein, No. 1018013
Tom B. Scott-Sharoni, No. 90004006 (admission pending)
Groom Law Group, Chartered
1701 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 857-0620
Fax: (202) 659-4503
lgolumbic@groom.com
slevin@groom.com
sbronshtein@groom.com
tscott-sharoni@groom.com